UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.                          REPORT AND RECOMMENDATION

Garrick Edward Lawrence,

        Defendants.          Crim. No. 05-333 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Garrick Edward Lawrence:

    1.    The Defendant's Motion to Suppress Evidence Obtained Pursuant to a Warrantless Search.

    2.    The Defendant's Motion to Suppress Evidence Seized Pursuant to an Illegal Arrest.

    3.    The Defendant's Motion to Exclude Statements of the Defendant.

A Hearing on the Motions was conducted on November 22, 2005, at which time, the Defendant appeared personally, and by John H. Hughes, Esq., and the Government appeared by Christian S. Wilton, and Erica H. MacDonald, Assistant United States Attorneys. For reasons which follow, we recommend that each of the Defendant's Motions to Suppress Evidence be denied.[1]

## II.  Factual Background

The Defendant is charged with one Count of being a Felon in Possession, in violation of Title 18 U.S.C. §§922(g)(1). The alleged offense is said to have occurred on or about May 1, 2005, in this State and District. As pertinent to the charge, and to the Motions now before us, the operative facts may be briefly summarized.[2]

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions. Leave was granted, and the last brief on the issues was received on December 23, 2005, at which time, the Motions were taken under advisement. See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the

(continued...)

At the Hearing on the Defendant's Motions, the Government presented testimony from Jason Defoe ("Defoe"), who, at the time of the events in question, was a Red Lake Tribal Police Officer,[3] William Branchaud ("Branchaud"), who is a Corporal with the Red Lake Tribal Police Department, and Russell Traurig ("Traurig"), who is a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms.  In turn, the Defendant presented testimony from Paula Lawrence ("Paula"), who is the Defendant's sister, and who, apparently, was the owner of the residence where the Defendant was living at the time of the arrest, and search, that are being challenged by the Defendant's Motions.[4]

---

[2](...continued)
facts and law may require.  See, <u>United States v. Moore</u>, 936 F.2d 287, 288-89 (6th Cir. 1991); <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 610 (9th Cir. 1990).

[3]Defoe testified that he has since resigned from his position with the Red Lake Police Department.

[4]Both officers testified concerning their belief that the Defendant lived with his mother, Gwen Lawrence ("Gwen"), as opposed to Paula.  However, Paula testified that, at the time of the pertinent events, the Defendant resided at her home, and that he had lived there for approximately five (5) months.  The Government does not challenge Paula's testimony as to the residency of the Defendant, and neither officer testified as having actual knowledge of the Defendant's place of residence.  Accordingly, for the purpose of this Motion, we find that the Defendant was living with his sister Paula, at the time of the challenged search and arrest.

(continued...)

On May 1, 2005, at approximately 10:15 o'clock p.m., Nicole Oakgrove, who is a dispatcher for the Red Lake Tribal Police Department, received a call from Gwen Lawrence ("Gwen"), who is the Defendant's mother, reporting that the Defendant was drunk; that he was acting up; that he was located at the residence of his sister, Paula; and that there was a possibility that a firearm was involved. [T. 12, 13]. Gwen further requested that an officer speak to her before responding to the call. [T. 13]. Defoe was advised of Gwen's call to the dispatcher, and agreed to respond by proceeding to Gwen's residence. [T. 13].

En route to Gwen's residence, which is in the "Barton's Camp/Walking Shield Village" area of the Red Lake Indian Reservation, and which is approximately one mile outside of the town of Red Lake, Defoe contacted Branchaud by police radio, in order

---

[4](...continued)

The Defendant's place of residence is pertinent to his Motion which challenges the search of the Paula's residence, as the Supreme Court has held that, "in order to claim the protections of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched and that the expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998), citing Rakas v. Illinois, 439 U.S. 128, 143-44 (1978). Since the Record reflects that the Defendant was residing at Paula's house, and had been for several months, we are satisfied that he had a reasonable expectation of privacy in Paula's residence and, as a result, he has "standing" to challenge the search at issue. Id.; Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)(finding that overnight guest at the residence of another has reasonable expectation of privacy in the residence).

to apprise him of the situation, and to request his assistance, given the possibility that a firearm was involved.  [T. 13, 42].  Branchaud agreed to assist Defoe, and both officers proceeded to Gwen's residence.

Defoe arrived at Gwen's residence prior to Branchaud, and Gwen met him at the front door.  Defoe described Gwen as being in "hysterics," as she told him that the Defendant was drunk, that he was at Paula's house, and that she had observed at least two other people present at Paula's residence, and that she made the statement "you know how he gets when he's drunk, he tries to hurt himself."  [T. 15, 27].  She further advised Defoe that, upon recognizing the Defendant's condition, she had removed a number of children from Paula's house, but that Paula had subsequently returned from work and had taken the children from Gwen's house to her own residence, which is where the Defendant was believed to be located.  [T. 15].  Gwen also disclosed that Paula had communicated to her that she had observed the Defendant drinking at her residence; that the Defendant was in possession of a loaded gun; and that she had observed blood on the walls of her house.[5]  [T. 15, 16, 83].  Gwen related this

---

[5]There is some discrepancy as to whether Paula returned to Gwen's residence after she had observed the Defendant with the firearm, [T. 16], or whether she placed a telephone call to the Gwen. [T. 83].  This discrepancy is immaterial to our

(continued...)

information to Defoe, and expressed her fear that something bad would happen to Paula, the Defendant, and/or the children, who were apparently with Paula. At the time that she provided this information to Defoe, Gwen was unsure as to the whereabouts of Paula and the children.

Following their conversation with Gwen, Defoe and Branchaud drove to Paula's residence, which was located approximately one and one-half miles from Gwen's residence, in the "Bayliff Lake/Walking Shield Village" area. [T. 16, 17]. Upon arriving at Paula's house, both Defoe and Branchaud positioned their police vehicles diagonally, in the driveway, as a precautionary measure, considering the report of the Defendant's possession of a loaded firearm. [T. 17, 18, 44]. Both officers testified that they could see the Defendant through a window in the front of the house, and that the Defendant was observed moving around the room. [T. 17, 44]. At some point, Defoe observed the Defendant look out of the window at the officers, [T. 20], and at another point, the officers observed the Defendant lift up a mattress, and make

---

[5](...continued)
determination of the pending Motions, as the Record is unequivocal that Paula related her observations to Gwen, who then disclosed the information to Defoe.

motions as if he were hiding something, or retrieving something under the mattress. [T. 17, 21, 45].

Both officers exited their respective vehicles. Defoe was armed with his duty issued shotgun, while Branchaud was carrying a duty issued M-4 rifle. [T. 19, 44]. The officers' decision to arm themselves with the weapons was based upon their belief that the Defendant was armed with a rifle, and out of an abundance of caution for their own safety. [T. 19, 44]. Both officers positioned themselves behind the rear quarter of their police vehicles. Using a public address system, Branchaud directed the Defendant to come out of the house with his hands up. [T. 20, 21, 45]. The Defendant, who was approximately twenty-five (25) to thirty (30) feet away from the officers, did not respond to Branchaud's directive, but continued to walk around the room. [T. 21, 46]. Branchaud directed the Defendant to come out of the house with his hands up a second time, and again, the Defendant appeared to ignore the officers' directive. [T. 46]. Defoe testified that, during this time, it appeared that the Defendant was fumbling with something in front of him, but that his hands were not visible to the officers through the window. [T. 21, 22].

Since the Defendant had not responded to Branchaud's directives, and since he believed that there could be someone inside the residence who was hurt, Branchaud

made the decision to enter Paula's home. [T. 46, 47]. A screen door to the house was closed, but the interior door of the house appeared to be open. [T. 22]. Branchaud and three other officers, who had subsequently arrived on the scene, entered Paula's residence, while Defoe maintained visual contact with the Defendant. [T. 22, 53]. The officers proceeded to "clear" the living room and kitchen area, by conducting a cursory search, in order to assure that there were no other threats to officer safety, or injured persons, in those areas of the house. [T. 47]. None of the officers, who entered the residence, had received permission from Paula, or the Defendant, to proceed into the home.

After clearing the living room and kitchen areas, the officers approached the room where it was believed that the Defendant was located, and Branchaud directed the Defendant to come out of the room. [T. 48]. The Defendant did not respond, and Branchaud pushed the door open, in order to gain entry. The Defendant turned around to face the officer, and asked the officers to explain what was happening. Branchaud directed the Defendant to show his hands and, after the Defendant complied, Branchaud directed the Defendant to turn around and place his hands behind his back. [T. 48]. The Defendant complied, and Branchaud placed the Defendant in handcuffs, and  another officer -- Justin Nelson ("Nelson") -- escorted

the Defendant out of the room.  [T. 48, 53].  Defoe was advised that the Defendant had been detained, and he entered the house, in order to escort the Defendant to Defoe's squad car.  Defoe testified that the Defendant appeared to be agitated, and that, at some point during his dealings with the Defendant, the Defendant had threatened Defoe.  Defoe placed the Defendant in the back seat of his police vehicle, at which time, the Defendant began to kick at the window of the vehicle.

While Defoe was escorting the Defendant to his vehicle, several of the other officers were clearing the house, in order to determine whether anyone was hurt or hiding, [T. 33], and Branchaud was attempting to retrace the Defendant's movements that he had observed upon his initial arrival.  [T. 49].  In doing so, Branchaud slightly pushed the mattress up with his foot, and observed the butt of a rifle stock that had been placed under the mattress.  Shortly after that discovery, Branchaud heard Gwen enter the house, walk down the hallway, and question one of the officers as to whether they had retrieved the Defendant's gun.  [T. 49, 50].  Branchaud instructed the officer not to let Gwen come back to the area near the Defendant's room, as they had not finished clearing the residence.  [T. 50].

Branchaud testified that he only performed a limited search of the room where the Defendant was found, in that he did not search the closets, or under the bed, but

only those areas that he could see in the room.  [T. 49].  Branchaud also testified that, at the time that he discovered the gun, the Defendant had already been placed in handcuffs, and escorted out of the room, but that Branchaud, and the other officers, had not finished clearing the residence.  [T. 55].

Following his discovery of the firearm, Branchaud contacted an unidentified police Sergeant, who was also at Paula's residence, and was advised by the Sergeant to leave the firearm where it had been found, so that it could be photographed.  [T. 49].  The firearm was eventually removed from its location, and it was identified as an SKS assault rifle.  [T. 50].  At the time that it was recovered, there was one active round in the chamber of the gun, four rounds in the magazine, and the safety mechanism was disengaged.  [T. 50].

The Defendant was eventually placed under arrest on Tribal charges of disorderly conduct, handling a dangerous weapon, obstructing legal process, and terroristic threats.  He was subsequently booked, by Defoe, on those charges and, on June 1, 2005, the Defendant entered a plea agreement in Tribal Court, whereby a Judgment was entered against the Defendant on the charges of disorderly conduct, and handling a dangerous weapon, while the charges of terroristic threats, and obstructing legal process, were dismissed.  See, Government Exhibit 2.  In those proceedings, the

Defendant was represented by Donald R. Cook, Sr., who is a "lay advocate," and who is licensed to practice before the Red Lake Tribal Court.  See, Government Exhibits 1, 9, 10.  As a result of the plea agreement, a $600.00 fine was imposed upon the Defendant, as well as a suspended thirty (30) day jail sentence.

On or about May 5, 2005, Cliff Martell, who is an Investigator for the Red Lake Police Department, contacted Traurig concerning the Defendant's apparent possession of the SKS rifle.  [T. 58].  He subsequently transmitted the police reports, from the incident on May 1, 2005, to Traurig and, in June, Traurig retrieved the firearm from the Red Lake Police Department.  [T. 58].  On September 13, 2005, Traurig and Russell Thomas ("Thomas"), who is also an Investigator with the Red Lake Tribal Police Department, interviewed the Defendant at Paula's residence.  At the time of the interview, Traurig had read the pertinent police report, and was made aware of the Tribal charges against the Defendant, as well as the disposition of those charges, by his tribal partner with the Red Lake Police Department.  [T. 64].  The interview was part of an investigation into whether the Defendant had committed a Federal crime, so as to determine whether a recommendation of a Federal criminal charge would be warranted.

Upon their arrival at Paula's residence, Traurig, who was dressed in plainclothes, found the Defendant outside of the house, and he introduced himself to the Defendant. Traurig then confirmed the Defendant's identity, and requested that the Defendant speak to him. The Defendant proceeded to walk towards Traurig's vehicle, and he started to get inside of the vehicle. Traurig told the Defendant that he did not have to get into the vehicle, and that the questioning would only take a couple of minutes. Traurig also advised the Defendant that he was not under arrest, that the decision of whether to answer his questions was the Defendant's to make, and that he could end the interview at any time. [T. 60]. The interview lasted approximately ten (10) minutes, during which time, the Defendant was responsive to Traurig's questions. At no time during the interview did the Defendant request an attorney, or express his desire to end the interview, and Traurig testified that he did not threaten the Defendant, in any way, and that the Defendant did not appear to be intoxicated.

### III.  Discussion

The Defendant argues that the officers' warrantless entry into Paula's residence, the ensuing search, and his subsequent arrest, were each unlawful under the Fourth Amendment. As a result of this asserted illegality, the Defendant urges that the firearm that was retrieved in Paula's home, as well as the statement made by the Defendant on

September 13, 2005, must be suppressed as the fruit of the poisonous tree.  See,

United States v. Wong Sun, 371 U.S. 471, 485-88 (1963).[6]  Each of the Defendant's

Motions will be addressed, in turn.

      A.    The Defendant's Motion to Suppress Evidence Obtained Pursuant to an Illegal Search.

      1.    Standard of Review.  "'[S]earches and seizures inside a man's

house without a warrant are per se unreasonable in the absence of some one of a

number of well defined 'exigent circumstances.''"  Payton v. New York, 444 U.S.

573, 586 n. 25 (1980), quoting Coolidge v. New Hampshire, 403 U.S. 443, 477-78

(1971).  However, "[t]he [exigent circumstances] exception justifies immediate police

action without obtaining a warrant if lives are threatened, a suspect's escape is

imminent, or evidence is about to be destroyed."  United States v. Ball, 90 F.3d 260,

263 (8th Cir. 1996), citing Michigan v. Tyler, 436 U.S. 499, 509 (1978); Warden v.

Hayden, 387 U.S. 294, 298-99 (1967); Ker v. California, 374 U.S. 23, 42 (1963);

---

      [6]In his post-Hearing submission, the Defendant advises that he has withdrawn his Motion to Suppress Statements, to the extent that the Motion challenged the admissibility of the statements as being elicited in violation of his Sixth Amendment right to counsel.  However, the Defendant has maintained that his statement to Traurig, on September 13, 2005, should, nonetheless, be suppressed as the fruit of the assertedly illegal search and arrest.

United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988).   As our Court of

Appeals long ago explained:

> [T]he emergency or exigency doctrine may be stated as
> follows:  police officers may enter a dwelling without a
> warrant to render emergency aid and assistance to a person
> whom they reasonably believe to be in distress and in need
> of that assistance.  In applying this doctrine, two principles
> must be kept in mind.  (1) Since the doctrine is an exception
> to the ordinary Fourth Amendment requirement of a warrant
> for entry into a home, the burden of proof is on the state to
> show that the warrantless entry fell within the exception.
> McDonald v. United States, 335 U.S. [451] at 456, 69 S.Ct.
> 191 [1948]; United States v. Jeffers, 342 U.S. 48, 51, 72
> S.Ct. 93, 96 L.Ed. 59 (1951).  (2) An objective standard as
> to the reasonableness of the officer's belief must be
> applied.

> "* * * In justifying the particular intrusion the police officer
> must be able to point to specific and articulable facts which,
> taken together with rational inferences from those facts,
> reasonably warrant that intrusion. * * * And in making that
> assessment it is imperative that the facts be judged against
> an objective standard: would the facts available to the
> officer at the moment of the seizure or the search 'warrant
> a man of reasonable caution in the belief' that the action
> taken was appropriate?"  Terry v. Ohio, 392 U.S. 1, 21-22,
> 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

Root v. Gauper, 438 F.2d 361, 364-65 (8th Cir. 1971); Mincey v. Arizona, 437 U.S.
385, 392 (1978)("We do not question the right of the police to respond to emergency
situations," and "the Fourth Amendment does not bar police officers from making
warrantless entries and searches when they reasonably believe that a person within is
in need of immediate aid.").

"'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency,'" "[a]nd the police may seize any evidence that is in plain view during the course of their legitimate emergency activities."  Mincey v. Arizona, supra at 392-93, quoting Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963), and citing Michigan v. Tyler, supra at 509-10; Coolidge v. New Hampshire, supra at 465-66.

        2.    Legal Analysis.  Based on the objective circumstances that were presented to the investigating officers, we are persuaded that exigent circumstances were presented so as to justify the officers' entry into the Paula's home.  "Although the exigent-circumstances exception is narrowly drawn, United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996), it does justify immediate police action without a warrant under limited circumstances, such as where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed."  United States v. Francis, 327 F.3d 729, 735 (8th Cir. 2003), citing Michigan v. Tyler, supra at 509.  Notably, our Court of Appeals has consistently recognized that the presence of blood, in and around a residence, supports a finding of exigent circumstances, necessary to justify a warrantless intrusion into such a residence.  See, United States v. Janis, 387 F.3d 682, 687-88 (8th Cir. 2004)(finding that exigent circumstances were present where officer

- 15 -

had been advised that a firearm, which was used in a shooting, was located inside of the defendant's home, and a puddle of blood was observed in the driveway, along with a trail of blood leading to the defendant's home); United States v. Gill, 354 F.3d 963, 969 (8th Cir. 2004)(exigent circumstances were present to conduct a limited search of the defendant's apartment based on observation of blood on the defendant's shirt, with no apparent wound); United States v. Leveringston, 397 F.3d 1112, 118 (8th Cir. 2005), cert. denied, --- U.S. ---, 126 S.Ct. 159 (2005)(officers' observation of blood on the hands and shirt of an individual suspected of drug activities created exigent circumstances to enter the hotel room where the individual had been found in order to investigate whether another person was injured and in need of assistance); see also, United States v. Chipps, 410 F.3d 438, 443 (8th Cir. 2005)(finding that agent who observed a trail of blood near the area of a reported assault could reasonably have believed that someone's life was in immediate danger).   Similarly, an individual's intoxication has also been found to support an officer's warrantless entry into a private residence.   See, United States v. Nord, 586 F.2d 1288, 1290-91 (8th Cir. 1978)(officers were justified in entering the defendant's apartment in responding to a call for immediate aid, in which it was reported that the defendant was inside the apartment and intoxicated).

Here, Branchaud and Defoe had been advised by Gwen that the Defendant was inside of Paula's house, that he was intoxicated, and that he was in possession of a loaded firearm.  Gwen had also reported that other persons, including children, may have been present in the home, and that Paula had observed blood on the walls of the house.  Gwen, who is the mother of the Defendant, also related her concerns as to the Defendant's propensity to self-injury when intoxicated.  Such representations, if believed, are sufficient to create a reasonable belief that Paula's house contained individuals who may have been injured, or who were otherwise in immediate need of assistance.  See, United States v. Gill, supra at 969; United States v. Janis, supra at 687-88; United States v. Nord, supra at 1290-91.

In arguing against the presence of exigent circumstances, the Defendant has emphasized the officers' reliance on Gwen's representations, as opposed to any direct observations by the officers of a firearm, blood, or other apparent criminal activity.  However, such an argument is unavailing, as the reliability of Gwen's representations is demonstrated, in part, by the fact that Gwen made her representations to the officers, in person, see United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (ability of officer to question an informant face-to-face, and to assess credibility, "gives greater weight to [the officer's] decision to rely on the informant's

information"), the officers' ability to hold her accountable in the event of a fabrication, see, <u>United States v. Solomon</u>, --- F.3d ---, 2005 WL 3501351 at *2 (8th Cir., December 23, 2005), quoting <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000)("[A] known informant * * * can be held responsible if her allegations turn out to be fabricated."), as well as the Defendant's presence in the place in which Gwen had reported that he would be located.  See, <u>United States v. Carpenter</u>, 341 F.3d 666, 669 (8th Cir. 2003)("[C]orroboration of minor, innocent details may support finding of probable cause."), citing <u>United States v. Tyler</u>, 238 F.3d 1036, 1039 (8th Cir. 2001).

Moreover, Gwen's representations must be considered in conjunction with the Defendant's peculiar behaviors in lifting the mattress, in what appeared to be an effort to hide, or retrieve something, and his failure to respond to the officers' directives. As such, considering the totality of the circumstances, we are satisfied that the officers reasonably believed that there were persons in the house who might have been hurt, or who were otherwise in need of immediate aid.  Accordingly, we find that exigent circumstances justified the officers' entry into Paula's home, as well as their search for injured persons.  We recognize that the exigent circumstances exception admits of no bright-line test and, while our separation, both by time and distance, invites insouciance as to the real urgencies which then confronted the investigating officers,

- 18 -

we are convinced, by the totality of the circumstances then confronting those officers, that this is one of those unique instances when the exigent circumstances doctrine applies.

However this conclusion does not end our analysis, as the firearm in question was not in "plain view," but was discovered only after Branchaud had purposely moved the mattress with his foot. See, Arizona v. Hicks, 480 U.S. 321, 325 (1987) (moving an object even a few inches constitutes a search under the Fourth Amendment).[7] Nevertheless, we find that the limited search for the firearm, in the area beneath the mattress, was not unreasonable under the Fourth Amendment. See, United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989); cf., United States v. Carter, 98 Fed.Appx. 570, 571 (8th Cir. 2004)(rejecting argument that seizure of weapon, which was not clearly shown to have been in plain view, was not unlawful under the exigent circumstances doctrine).

In Antwine, undercover agents with the Federal Bureau of Investigation, who were dressed in plainclothes, confronted the defendant, who was the suspect in an

---

[7]This Record is bereft of any evidence which might suggest that lifting the mattress was part of an effort to search for injured persons, or that the area, under the mattress, was large enough to create a reasonable belief that injured persons could have been concealed there.

armed robbery investigation, in an effort to lure the defendant from his home, in order to effect his arrest.  Id. at 1145.  At some point during that encounter, the defendant drew a firearm, and pointed it at the agents, who proceeded to leave the area.  Id. at 1146.  More law enforcement officers were called to the scene and, using a public address system, one of the officers directed the defendant to come out of his apartment.  The defendant complied, and was promptly arrested.  Following the arrest, an officer entered the defendant's apartment, and conducted a protective sweep, which revealed the presence of two children.  The officers made the decision to leave the children in the apartment and, out of a concern for the safety of the children, one of the agents entered the defendant's apartment and retrieved the gun that the defendant had brandished earlier.  Id.  The Agent located the gun in a partially opened drawer to a dresser that was located in the defendant's bedroom.  The agent seized the gun, and left the apartment.  Id.

The defendant, in Antwine, moved to suppress the gun, on the ground that the agent's warrantless entry, and search of the defendant's home, violated his Fourth Amendment rights.   The Court disagreed, and found that exigent circumstances justified the agent's entry, his search for the weapon, as well as his seizure of the weapon when found.  In so holding, the Court relied, in part, on the Supreme Court's

recognition, in <u>New York v. Quarles</u>, 467 U.S. 649 (1984), of a "public safety" exception to the requirement that a suspect be advised of his constitutional rights, under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), prior to custodial interrogation.  <u>Id.</u> at 1146-47.  Noting that <u>Quarles</u> had involved a determination as to the whereabouts of a gun, and that the Supreme Court's reasoning was partially predicated on the "exigent circumstances" exception to the Fourth Amendment's Warrant requirement, the Court, in <u>Antwine</u>, observed that "[t]he clear implication of <u>Quarles</u> is that a warrantless seizure of a weapon may be considered 'reasonable' within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety."  <u>Id.</u> at 1147.  The Court went on to find that the agent's search for, and seizure of, the firearm was reasonable, out of a concern for the safety of the children.  <u>Id.</u>; see also, <u>United States v. Wells</u>, 702 F.2d 141, 144 (8th Cir. 1983) (concern for safety justified an officer's seizure of a paper bag, which had been reported to contain a firearm).

Here, Branchaud had been advised that there may have been children in the house at the time of the entry and, based on Paula's occupation of the house, as well as Gwen's attempted entry into the house, it would have been reasonable to believe that, once the officers left, Paula, the children, and possibly Gwen, would re-enter the

residence.  Therefore, since Branchaud had also been advised that the Defendant had been in possession of a loaded rifle, which had not been discovered at that point, during the officers' attempts to clear the house, we find that Branchaud's search "did not exceed what was necessitated by the exigency."  See, United States v. Antwine, supra at 1147; cf., United States v. Carter, supra at 571 ("Finally, it was permissible to seize the second rifle [i.e., the one that had not been shown to be in plain view] temporarily as a precaution to assure the safety of those in the house, and to seize the rifle once officers learned that [the defendant] was a convicted felon.").  Notably, like the agent in Antwine, Branchaud did not engage in a full search of the premises, but only searched those areas that were visible, as well as the area where the Defendant had previously been observed in what appeared to be an attempt to retrieve or conceal something.  Accordingly, we recommend that the Defendant's Motion to Suppress Evidence Obtained as a Result of an Illegal Search be denied.

      B.    The Defendant's Motion to Suppress Evidence Obtained Pursuant to an Illegal Arrest.

      1.    Standard of Review.  The Defendant has also sought the suppression of the firearm, on the ground that his arrest was not supported by probable cause to believe that he had engaged in criminal activity.  "Determining

probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"   United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting Olinger v. Larson, 134 F.3d 1362, 1366 (8th Cir. 1998); Tokar v. Bowersox, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense.").

We recognize, and accept, that an officer engaged in an arrest need not personally have found probable cause in order to lawfully effect the arrest.  As the

- 23 -

Court explained, in <u>United States v. Gillette</u>, 245 F.3d 1032, 1034 (8th Cir. 2001), cert.

denied, 534 U.S. 982 (2001):

> Where officers work together on an investigation, we have
> used the so-called "collective knowledge" theory, United
> States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000), to
> impute the knowledge of one officer to other officers to
> uphold an otherwise invalid search or seizure.  Under this
> rationale, the validity of a search "may be based on the
> collective knowledge of all of the law enforcement officers
> involved in an investigation if * * * some degree of
> communication exists between them," id.  See also United
> States v. Morales, 238 F.3d 952, 953 (8th Cir. 2001), and
> United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997).
> The requirement that there be a degree of communication
> serves to distinguish between officers functioning as a
> "search team," United States v. O'Connell, 841 F.2d 1408,
> 1419 (8th Cir. 1988), cert. denied, 487 U.S. 1210, 108 S.Ct.
> 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct.
> 799, 102 L.Ed.2d 790 (1989), and officers acting as
> independent actors who merely happen to be investigating
> the same subject.

"'The determination of whether probable cause exists must not rest on isolated facts;

rather it depends on the cumulative effect of the facts in the totality of

circumstances.'"  <u>Tokar v. Bowersox</u>, supra at 1047, quoting <u>United States v.</u>

<u>Everroad</u>, 704 F.2d 403, 406 (8th Cir. 1983).  We keep in mind, however, that

"[p]robable cause does not require a prima facie showing of criminal activity, but only

the probability of criminal activity."  <u>Id.</u>

2.    <u>Legal Analysis</u>.  At the outset, we express some uncertainty as to the Defendant's standing to challenge the probable cause for his arrest on May 1, 2005.  Since it is undisputed that the Defendant pled guilty to those charges, he is ill-positioned to now question the sufficiency of the probable cause which led to his arrest on the Tribal charges of disorderly conduct, and handling a dangerous weapon. Cf., <u>Williams v. Schario</u>, 93 F.3d 527, 528-29 (8th Cir. 1996)("The district court correctly concluded that a guilty plea forecloses a section 1983 claim for arrest without probable cause.").  If, as the Defendant now appears to contend, the Tribal Officers were without probable cause to effect the Defendant's arrest on those Tribal charges, any such argument was waived upon his plea of guilty.

However, we proceed to address the issue as the Defendant may well be arguing that his arrest was effected, when he was restrained and removed to Defoe's squad car, before the officers uncovered the weapon in question.  While that challenge would, again, appear to have been waived by his guilty plea, in the interests of completeness we address the same.  Under this construction, the Defendant urges that his arrest was unlawful because the officers had not observed him with a firearm, and did not have any other direct evidence that he had committed a crime.  The Government urges that the arrest of the Defendant occurred after the discovery of the

- 25 -

firearm which, in turn, justified the Defendant's arrest for disorderly conduct, and for handling a dangerous weapon.

The testimony, at the Hearing, reflects that, upon their entry into the Defendant's room, the officers placed the Defendant in handcuffs, escorted him out of the house, and placed him in the back of the squad car. According to Defoe's testimony, the purpose of placing the Defendant in such restraints was to "detain" him, for officer safety reasons, during the conduct of their investigation into the well being of the individuals who were suspected of being in the house. [T. 34, 35]. Based on this testimony, the Government has not argued that probable cause was present to arrest the Defendant prior to the officers' entry into the home, while the Defendant's argument appears to be based on the events which occurred prior to the discovery of the firearm. Given this divergence in the parties' arguments, we turn to a determination as to whether the initial detention of the Defendant constituted an arrest, for which probable cause was required. We reiterate, that we do so only for completeness's sake, as we are satisfied that the Defendant's guilty plea precludes this belated challenge to his lawful arrest by Tribal authorities.

Notably, the Supreme Court has recognized a number of different circumstances upon which law enforcement officers may temporarily curtail an

individual's freedom of movement upon a lesser showing than probable cause. See, e.g., <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968); <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 563-64 (1978); <u>Michigan State Police v. Sitz</u>, 496 U.S. 444, 450-451 (1990). The Supreme Court has also recognized that, during the execution of a search at a private residence, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." <u>Michigan v. Summers</u>, 452 U.S. 692, 702 (1981). Given such recognition, the Court recently reaffirmed that the interests of "'preventing flight in the event that incriminating evidence is found'; 'minimizing the risk of harm to officers'; and facilitating the 'orderly completion of the search,'" allow for a law enforcement officer, who is in possession of a Search Warrant, to detain the occupants of the residence, during the conduct of the search. <u>Meuhler v. Mena</u>, --- U.S. ----, 125 S.Ct. 1465, 1469-70 (2005), quoting <u>Michigan v. Summers</u>, supra at 702-703. Such "authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." <u>Id.</u> at 1470, quoting <u>Michigan v. Summers</u>, supra at 705 n. 19. Moreover, while the Court has also cautioned, that the use of handcuffs during the execution of searches should neither be routine, nor prolonged, <u>id.</u> at 1472 (Kennedy, J. concurring), "th[e] safety

risk inherent in executing a search warrant for weapons [is] sufficient to justify the use of handcuffs" in detaining the occupants of the residence to be searched.  Id. at 1471.

The entry into the Defendant's home was predicated on exigent circumstances, as opposed to the execution of a Search Warrant.  As such, the rule in Summers is, to that extent, distinguishable.  Specifically, the Court's observation that "the detention of the occupant is 'surely less intrusive than the search itself' and the presence of a warrant insures that a neutral magistrate has determined that probable cause exists to search the home,"  Meuhler v. Mena, supra at 1470, quoting Michigan v. Summers, supra at 701, implies that a judicial determination of probable cause provides the justification for such "categorical" detentions.  See, Ingram v. City of Columbus, 185 F.3d 579, 591-92 (6th Cir. 1999).[8]  Nonetheless, the precise issue remains open, and

---

[8]In Ingram v. City of Columbus, 185 F.3d 579, 591-92 (6th Cir. 1999), the Court held that officers acted unreasonably, when they entered a residence in pursuit of a fleeing suspect, and placed all of the occupants of the house in handcuffs, at gunpoint. In so holding, the Court noted that, unlike Summers, there had been no judicial predetermination of probable cause, and the detaining officers did not have any reason to fear for their safety.  Id.  Specifically, the Court noted the fleeing suspect had not displayed a weapon; that the officers contained no independent knowledge that would lead them to believe that the fleeing suspect was a dangerous individual; and that none of the detained individuals' actions would have reasonably led them to believe that weapons were contained inside of the residence.  Id. at 592.  Plainly, the circumstances confronting the officers, in Ingram, are distinct from those which the
(continued...)

the Court, in <u>Summers</u>, acknowledged that "[t]he fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstance in the absence of a warrant." <u>Id.</u>, at 703 n. 17.

Ultimately, however, we need not determine whether a lawful search of a private residence, which is predicated upon the presence of exigent circumstances, carries with it the "categorical" authorization to detain the occupants of the house. Rather, we find that the officers had a reasonable basis to believe that the Defendant presented a threat to their safety, during their lawful entry into the residence, that was sufficient to justify the Defendant's detention. See, <u>United States v. Maddox</u>, 388 F.3d 1356, 1362-63 (10th Cir. 2004). In <u>Maddox</u>, the Court determined that the doctrine set forth in <u>Maryland v. Buie</u>, 494 U.S. 325 (1990) -- which allows officers, who are effecting an arrest in a private residence, to conduct limited "protective sweeps" -- also applies to "protective detentions," since "the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to

---

[8](...continued)
Tribal officers faced, here.

temporarily seize any dangerous individuals that are located during the search." Id. at

1362.

Our Court of Appeals recently summarized the rule, in Buie, as follows:

> In Buie the Supreme Court established a two-prong test for determining whether a protective sweep incident to an arrest was constitutionally permissible. First, the Buie Court held "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334, 110 S.Ct. 1093. Second, the Court permitted a broader sweep "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337, 110 S.Ct. 1093.

United States v. Waldner, 425 F.3d 514 (8th Cir. 2005); see, United States v. Maddox, supra at 1362.

Applying the Buie framework, the Court, in United States v. Maddox, supra at 1365-

66, held that the officer's reasonable suspicion, that the defendant posed a threat to

officer safety, justified his detention during the execution of an Arrest Warrant.  In

part, the Court's finding of a reasonable suspicion was predicated upon the officer's

observation of the defendant reaching under the seat of his pickup truck, following his

arrival at the residence where the Warrant was being executed, in what appeared to be

an attempt to either retrieve, or place, something beneath the seat, which the officer interpreted as "an unknown threat." Id. at 1359, 1366.

Here, the officers had received Gwen's report, that the Defendant was intoxicated, and that he was in possession of a loaded firearm. Furthermore, the officers observed the Defendant lift up the mattress which, to both Defoe and Branchaud, appeared to be an attempt to conceal or retrieve something, and the Defendant was nonresponsive to the officers' directive to leave the house. Accordingly, at the time of the search, the officers had an objectively reasonable suspicion to believe that the Defendant posed a threat to their personal safety. Id.; United States v. Long, 320 F.3d 795, 800-801 (8th Cir. 2003)(reasonable suspicion that the defendant could have a firearm at his disposal created a plausible concern for officer safety); cf., United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995)(Officers, who had been informed that other individuals and weapons were contained in a house, had a reasonable concern for their safety).[9]

---

[9]Unlike both Maddox, and Buie, the officers, here, did not enter the house to execute an Arrest Warrant, but rather, to search for persons who were injured, or who were otherwise in immediate need of help. Nevertheless, our Court of Appeals has acknowledged that the conduct of a protective sweep, under Buie, in a non-arrest situation, is still permissible, although it "requires a showing of a reasonable suspicion
(continued...)

Finding that the initial detention of the Defendant was reasonable, we turn to the Defendant's arrest, following the conclusion of the search.  At the time of his arrest, the Defendant's possession of a gun had been reported by Gwen, and the officers had discovered the loaded SKS rifle, with the safety mechanism disengaged, in the room where the Defendant had been found.  Section 504.12(a) of the Red Lake Band of Chippewa Indians Tribal Code makes it a misdemeanor to "recklessly handle[] or use[] a gun or other dangerous weapon so as to endanger the safety of another."  Accordingly, under the circumstances presented, we are satisfied that probable cause was present to believe that the Defendant had committed the crime of handling a dangerous weapon.

Furthermore, while we find the Defendant's initial detention, and arrest, to be permissible under the Fourth Amendment, the Defendant's Motion necessarily fails,

---

[9](...continued)
of dangerous individuals in the house."  United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005), citing United States v. Gould, 364 F.3d 578, 584 (5th Cir. 2004); United States v. Taylor, 248 F.3d 506, 513-14 (6th Cir. 2001); United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993); United States v. Patrick, 959 F.2d 991, 996-97 (D.C. Cir. 1992); United States v. Daoust, 916 F.2d 757, 758-59 (1st Cir. 1990). Accordingly, even in this non-arrest situation, our determination, that the officers had a reasonable suspicion to believe that the Defendant presented a threat to their safety, justified the Defendant's protective detention.

as the firearm was discovered pursuant to a lawful search of the Defendant's home, rather than his arrest.  Accordingly, even assuming that the Defendant's detention and arrest were unlawful, it would be improper to suppress the firearm, as it was discovered pursuant to a lawful search, and therefore, was not "fruit of the poisonous tree."  See, United States v. Reinholz, 245 F.3d 765, 777 (8th Cir. 2001), cert. denied, 534 U.S. 896 (2001)(finding that suppression was not required for evidence discovered during the lawful search of a vehicle where the arrest of the defendant was unlawful); United States v. Swayne, 700 F.2d 467, 469 (8th Cir. 1985); United States v. Williams, 633 F.2d 742, 744 (8th Cir. 1980).  Specifically, the justification for the limited search of the Defendant's room was not incident to the Defendant's arrest, but was predicated on the exigencies created by the reported possession of a loaded firearm, and the reasonable belief that other persons, including children, were, or would be, occupying the residence which was believed to contain the loaded firearm. Therefore, since we have found that the search conducted by Branchaud, which resulted in the discovery of the firearm, was reasonable, we recommend that the Defendant's Motion to Suppress Evidence Obtained Pursuant to an Unlawful Arrest be denied.

   C.    The Defendant's Motion to Suppress Statements, Admissions, and

Answers.

In his post-Hearing submissions, the Defendant advised that he was withdrawing his Motion to Suppress Statements insofar as it challenges, on Sixth Amendment grounds, the constitutionality of the statements taken by Traurig. Nonetheless, the Defendant seeks the suppression of those same statements as the fruit of his unlawful search and arrest. Since we find, for reasons stated, that the search of the Defendant's home, and the ensuing arrest, were both permissible under the Fourth Amendment, we recommend that the Defendant's Motion to Suppress Statements, Admissions, and Answers, also be denied.[10]

NOW, THEREFORE, It is --

---

[10]The Defendant does not expressly raise the issue but, nonetheless, we also find, and conclude, that, at the time of Traurig's interview, the Defendant was not in custody, as he was informed that he could stop the questioning at any time, that he need not engage in the interview, and that he was not under arrest. The Defendant did not request legal counsel; Traurig, and his Tribal partner, did not display weapons; the interview was conducted without threats or promises, and the Defendant appeared to understand the questions asked. During the course of the ten (10) minute interview, the Defendant was not restrained and, at the end of the interview, the Defendant was not arrested, and Traurig left the area. See, United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004)(listing factors pertinent to an "in custody" determination). While the Record is undisputed that Traurig did not provide the Defendant with a Miranda warning, see, Miranda v. Arizona, 384 U.S. 436, 444 (1966), we find no basis to conclude that the Defendant was in custody, such as would require such an advisory.

RECOMMENDED:

1.     That the Defendant's Motion to Suppress Evidence Obtained Pursuant to a Warrantless Search [Docket No. 26] be denied.

2.     That the Defendant's Motion to Suppress Evidence Obtained Pursuant to an Illegal Arrest [Docket No. 27] be denied.

3.     That the Defendant's Motion to Exclude Statements [Docket No. 28] be denied.


Dated:  January 10, 2006                    s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than January 30, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure

to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 30, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.